UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| BRANDY LIMA, AND MARJORIE HOFER, INDIVIDUALLY AND ON BEHALF OF DONALD HOFER; <br><br> Plaintiffs, <br><br> vs. <br><br> EQUITABLE FINANCIAL LIFE INSURANCE COMPANY, <br><br> Defendant. | 4:24-CV-04087-RAL <br><br><br> OPINION AND ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT |

This is an insurance dispute over whether Defendant Equitable Financial Life Insurance Company (Equitable) properly terminated a policy insuring the life of Donald Hofer. Donald, his wife Majorie Hofer, and the Hofers' daughter Brandy Lima (collectively "the Plaintiffs"), allege that Equitable failed to provide the required notice that the policy had lapsed. They assert claims for breach of contract, insurance bad faith, and unjust enrichment. They also seek a declaratory judgment ordering Equitable to remit the death benefit they claim is owed under the policy. Equitable moves for summary judgment on the Plaintiffs' claims and its counterclaim seeking a declaratory judgment that it did not breach the policy. This Court grants Equitable's motion on the Plaintiffs' claims for bad faith, unjust enrichment, and declaratory judgment, but denies the motion on the breach of contract claim and Equitable's counterclaim.

**I.      Facts**

1

Donald obtained a flexible premium variable life insurance policy (the Policy) from Equitable in 1989. Doc. 23 ¶ 6; Doc. 30 ¶ 6. Unlike a traditional whole life insurance policy, Donald's Policy did not require fixed premium payments to remain in force. Doc. 15-1 at 1; Doc. 23 ¶ 12; Doc. 30 ¶ 12; <u>Fleisher v. Phoenix Life Ins.</u>, 18 F. Supp. 3d 456, 460 (S.D.N.Y. 2014) ("Traditional whole life insurance policies require payment of a fixed monthly premium."). Instead, the policy owner could choose and adjust the frequency and the amount of premium payments. Doc. 15-1 at 1; Doc. 23 ¶ 12; Doc. 30 ¶ 12. Under the Policy, Equitable would deduct certain expense charges from Donald's premium payments and then place the remainder in his selected investment accounts. Doc. 15-1 at 1–2, 13; Doc. 23 ¶¶ 14–15; Doc. 30 ¶¶ 14–15. To remain in force, the Policy needed to have enough value to cover the monthly deductions for the cost of insurance and other fees. Doc. 15-1 at 12–13; Doc. 23 ¶¶ 9–11, 15; Doc. 30 ¶¶ 9–11, 15. If the Policy had insufficient funds to cover these monthly deductions, Equitable would mail the policy owner a written notice and give them a 61-day grace period to make the necessary payment:

> **Grace Period.** The duration of insurance coverage depends upon the Net Cash Surrender Value[1] being sufficient to cover the total monthly deductions described on Page 9. If the Net Cash Surrender Value at the beginning of any policy month is less than such deductions for that month, we will send a written notice to you and any assignee on our records at last known addresses stating that a grace period of 61 days has begun, starting with the beginning of that policy month. The notice will also state the amount of the premium payment sufficient to cover monthly deductions for 3 months.

Doc. 15-1 at 12; Doc. 23 ¶ 9; Doc. 30 ¶ 9. If the necessary sum was not paid during the grace period, the Policy would end:

> If we do not receive such amount at our Administrative Office before the end of the grace period, we will then (1) withdraw and

---

[1]The Net Cash Surrender Value is the policy account value minus any applicable surrender charge, policy loan, or loan interest. Doc. 15-1 at 17; Doc. 23 ¶ 10; Doc. 30 ¶ 10.

> retain the entire amount in your Policy Account, including any
> applicable surrender charge; and (2) send a written notice to you and
> any assignee on our records at last known addresses stating that this
> policy has ended without value.

Doc. 15-1 at 12; Doc. 23 ¶ 9; Doc. 30 ¶ 9.

Donald was diagnosed with dementia and began living in a nursing home around 2013, 24 years after the Policy first issued. Doc. 31 ¶ 4. As Donald's condition worsened, Marjorie began managing payment of the Policy's premiums.[2] Id. ¶ 5. The Policy lapsed 16 times while Marjorie was handling the premium payments because its value fell below the amount necessary to cover the monthly deductions.[3] Doc. 27 ¶ 9; Doc. 31 ¶ 6. For each of these lapses, Equitable mailed a notice to the last known address of the Policy's owner and someone made the required payment to prevent the Policy from terminating. Doc. 27 ¶ 9. Lima became aware of these lapses, saw some of Equitable's notices, and gave her mother money to make the payments to avoid cancellation. Doc. 31 ¶¶ 7–8.

Marjorie struggled to maintain the Policy, so Lima took over making payments in 2021. Doc. 23 ¶ 20; Doc. 30 ¶ 20; Doc. 31 ¶ 9. Lima set up an automatic withdrawal of $575 per month from her checking account to sustain the Policy. Doc. 23 ¶ 21; Doc. 30 ¶ 21; Doc. 31 ¶¶ 11–14. During a phone call in January 2021, Lima asked an Equitable representative whether her monthly $575 payment would "cover everything"; the representative replied that the cost of insurance was $527.12 a month, so the $575 payment "should be just fine." Doc. 31 ¶ 13; Doc. 31-2. Lima

---

[2]Marjorie has a durable power of attorney for Donald and is bringing Donald's claims in this case in a representative capacity. Doc. 12 at 1.

[3]An affidavit from Equitable says that the Policy lapsed 16 times between November 2011 and December 2020. Doc. 27 ¶ 9. Lima agrees that the Policy lapsed "several" times but does not recall exactly how many. Doc. 31 ¶ 6.

became the owner of the Policy in March 2021, and made herself the primary beneficiary of the Policy in November 2021. Doc. 23 ¶¶ 20, 22; Doc. 30 ¶¶ 20, 22; Doc. 27 ¶ 10.

Equitable began mailing annual reports to Lima at her address in Marion, South Dakota, once she became the Policy's owner. Doc. 23 ¶ 23; Doc. 30 ¶ 30. Equitable mailed Lima an annual report in August 2022 showing that the monthly deductions exceeded $590 and projecting that, if Lima continued paying $575 a month, the policy account value and cash surrender value would be only $583.54 by August 22, 2023.[4] Doc. 23 ¶¶ 24–25; Doc. 30 ¶¶ 24–25. The August 2022 annual report noted that the policy account and cash surrender value could fluctuate depending on Lima's investments and warned that the Policy "may be in danger of terminating without value in the next 12 months unless additional premium is paid." Doc. 15-2 at 4; Doc. 23 ¶¶ 26–27; Doc. 30 ¶¶ 26–27. The monthly $575 payment by ACH from Lima's account to Equitable continued after August 2022. Doc. 23 ¶ 28; Doc. 30 ¶ 28.

Equitable also sent Lima confirmation notices each month from August 2022 through July 2023 for the $575 monthly premium she paid. Doc. 23 ¶ 29; Doc. 30 ¶ 29; Doc. 27-3. These notices showed that the Policy's account value was declining. Doc. 23 ¶ 29; Doc. 30 ¶ 29; Doc. 27-3. The confirmation notice Equitable mailed to Lima on July 20, 2023, showed that the Policy's account value was $561.93. Doc. 23 ¶ 30; Doc. 30 ¶ 30; Doc. 27-3 at 34. The Policy lapsed on July 23, 2023, because its value dropped below that necessary to cover that month's deduction.[5] Doc. 23 ¶ 32; Doc. 30 ¶ 32.

---

[4] Lima agrees that the August 2022 annual report includes this information, Doc. 30 ¶¶ 24–25, but argues that the annual reports and notices Equitable sent would be unhelpful to those lacking a sophisticated understanding of Equitable's forms, Doc. 33 at 7.

[5] Lima agrees that she did not make any payments between July 23, 2023, and September 23, 2023, because Equitable did not make any automatic withdrawals from her account during the grace period. Doc. 33 at 5 n.2; see also Doc. 30 ¶ 36. The record is unclear whether an ACH for $575 occurred in July 2023.

The parties disagree about what happened next. Equitable claims that its automated computer system generated a notice of policy lapse and that its third-party vendor, Broadridge Financial Solutions, Inc. (Broadridge), mailed this notice to Lima at her address in Marion, South Dakota, on July 25, 2023. Doc. 23 ¶ 33; Doc. 27 ¶¶ 17–24; Doc. 27-4; Doc. 26 ¶¶ 4–9. Equitable filed a reconciliation summary report and an affidavit from its employee Muni Bhambri interpreting the report to show that Equitable sent the notice of policy lapse to Broadridge for printing on July 24, 2023. Doc. 27 ¶¶ 21–24; Doc. 27-5. Equitable also filed an affidavit from Broadridge employee Jason Rapino explaining that an automated system report attached to his affidavit shows that Broadridge mailed Lima the notice of policy lapse on July 25, 2023. Doc. 26 ¶¶ 3–9; Doc. 26-1. The notice Equitable claims it sent to Lima had her Marion, South Dakota, address listed at the top and was dated July 24, 2023. Doc. 27-4. The notice stated that the Policy's value could not cover the monthly deductions, that Lima needed to pay at least $2,070 by September 23, 2023, and that the Policy would terminate without value if she did not. Doc. 27-4. It also explained that reinstatement of the Policy after September 23, 2023, would be subject to evidence of insurability satisfactory to Equitable, which is consistent with the Policy terms. Id.

Lima did not pay the $2,070 by September 23, 2023. Doc. 23 ¶ 35; Doc. 30 ¶ 35. Equitable claims that its automated computer system generated a notice of policy termination and that Broadridge mailed this notice to Lima at her Marion, South Dakota, address on September 26, 2023. Doc. 30 ¶ 38; Doc. 27 ¶¶ 30–32. As with the notice of policy lapse, Equitable filed a reconciliation summary report and Bhambri's affidavit explaining that the report shows that Equitable sent the notice of policy termination to Broadridge for printing. Doc. 27 ¶¶ 30–32; Doc. 27-7. Rapino's affidavit explains that an attached automated systems report shows that Broadridge mailed Lima the notice of policy termination on September 26, 2023. Doc. 26 ¶¶ 10–12; Doc. 26-

2. The notice of policy termination Equitable says it sent to Lima explained that the Policy had terminated without value because Equitable had not received the payment it requested in the "recent lapse notice" and that Lima may be able to continue the insurance coverage subject to Equitable's approval. Doc. 27-6.

Lima tells a different story. She claims she never received the notice of policy lapse or the notice of policy termination and argues that Equitable's reports and affidavits do not prove that the notices were printed and sent to her. Doc. 33 at 12; Doc. 30 ¶¶ 33, 38; Doc. 31 ¶ 19. She filed a declaration describing her daily routine for collecting and sorting her mail, including bills she pays by check. Doc. 31 ¶¶ 20–22. She explains that she pays these bills by sending a check and declares that she hasn't missed a payment on any of these bills for the last five years. Id. ¶ 21. Lima paid multiple bills she received through the mail in July through September 2023 and declares that she had ample money in her checking account to pay the $2,070 needed to keep the Policy from terminating. Id. ¶ 23; Doc. 31-5. She agrees, however, that the notice of policy lapse and notice of policy termination were never returned as undeliverable to Equitable, maintaining that Equitable never sent them. Doc. 23 ¶¶ 34, 39; Doc. 30 ¶¶ 34, 39.

When Lima was doing her taxes around January 2024, she learned that Equitable had not taken the monthly payment from her checking account since July 2023.[6] Doc. 31 ¶ 15. Lima discovered her online Equitable account was closed, so she called Equitable on January 16, 2024. Doc. 31 ¶¶ 15–16; Doc. 31-4. An Equitable representative told Lima that the Policy was terminated on September 25, 2023, because of insufficient funds. Doc. 31 ¶¶ 16–17; Doc. 31-4.

---

[6]One of Equitable's statements of undisputed material fact says that "Lima did not make any payments to Equitable between July 23, 2023 and September 23, 2023." Doc. 23 ¶ 36. Lima explains that she did not prevent Equitable from making the monthly withdrawals during this time and that the lack of payments is due to Equitable's refusal to accept premiums during a policy lapse period. Doc. 30 ¶ 36.

Lima applied for reinstatement of the Policy shortly after the call with Equitable. Doc. 31 ¶ 25; Doc. 23 ¶ 40; Doc. 30 ¶ 40. The application showed that Donald had been diagnosed with progressive multiple sclerosis and neuropsychological degeneration consistent with possible dementia, had been living in a full care nursing home since 2013, suffered a seizure in 2021 and was now on anti-seizure medication, and needed a broken hip replaced in December 2023. Doc. 23 ¶ 41; Doc. 30 ¶ 41; Doc. 27-8. Lima called Equitable on February 1, 2024, after not hearing anything for two weeks. Doc. 31 ¶ 25; Doc. 31-7. She was told that her application for reinstatement would take at least 15 business days from receipt on January 22, 2024, to process. Doc. 31 ¶ 25; Doc. 31-7. Lima called Equitable again on March 13, 2024, to ask about the application. Doc. 31 ¶ 26; Doc. 31-8. The Equitable representative said that Equitable had denied the application and had sent a denial letter to Lima on March 1, 2024. Doc. 31 ¶ 27; Doc. 31-8. Lima said she had not received the denial letter, and the representative asked her to "please allow mailing time" to receive a copy of the letter. Doc. 31 ¶ 27; Doc. 31-8. Lima also denied having received the notice of policy lapse, prompting the Equitable representative to confirm that it had the correct address for Lima. Doc. 31-8. Equitable filed a letter addressed to Lima explaining that Equitable had denied her reinstatement application. Doc. 27-9; Doc. 27 ¶ 36. Equitable also filed a separate letter addressed to Donald explaining that the application had been denied because of his medical history. Doc. 27-9; Doc. 27 ¶ 36. Lima denies having received any notice that Equitable denied her application. Doc. 31 ¶ 27.

The Plaintiffs' amended complaint alleges that Equitable breached the Policy by failing to provide notice of the policy lapse and termination and wrongfully refusing to reinstate the Policy (Count I), seeks a declaratory judgment ordering Equitable to remit the $400,000 death benefit they claim they have been deprived of (Count II), alleges that Equitable engaged in insurance bad

faith (Count III), and alleges that Equitable was unjustly enriched by the nearly 40 years of premiums it received from the Plaintiffs (Count IV). Doc. 12. Equitable counterclaimed against the Plaintiffs, seeking a declaratory judgment that it did not breach the Policy by terminating it and denying Lima's application for reinstatement. Doc. 15. Equitable now moves for summary judgment on its counterclaim and all the Plaintiffs' claims and challenges standing of two of the Plaintiffs—Majorie Hofer and Donald Hofer. Doc. 22. As part of resisting the motion for summary judgment, the Plaintiffs assert a need to conduct a Rule 30(b)(6) deposition on Equitable's investigation prompting its refusal to reinstate the Policy for failure to avoid lapse. Doc. 32.

## II.    Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden to show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The nonmoving party must establish that a material fact is genuinely disputed by either "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A), (B); see also Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145–46 (8th Cir. 2012). A genuine issue of material fact exists if a "reasonable jury [could] return a verdict for either party" on a particular issue. Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011). Courts ruling on a summary judgment motion view the facts and inferences fairly drawn from the facts in the nonmoving party's favor, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986);

see also Baker v. Silver Oak Senior Living Mgmt. Co., L.C., 581 F.3d 684, 687 (8th Cir. 2009), but do not "resort to speculation," Baker, 581 F.3d at 687.

## III.    Analysis

### A.  Breach of Contract

The parties agree that South Dakota law governs in this case filed under diversity of citizenship jurisdiction, 28 U.S.C. § 1332. Secura Ins. v. Horizon Plumbing, Inc., 670 F.3d 857, 861 (8th Cir. 2012). The parties also agree that the Plaintiffs' breach of contract claim turns largely on what Equitable needed to do to notify Lima of a policy lapse. Equitable argues that all it needed to do was send Lima written notice of the policy lapse to the address she provided. The Plaintiffs disagree. They argue that South Dakota law required that Lima *receive* notice of the policy lapse and that Equitable breached the Policy by failing to provide sufficient notice and then terminating the Policy. The Plaintiffs also contend that there is a genuine issue of material fact over whether Equitable mailed the notice.

### 1.  The Policy did not require that Lima receive the notice of policy lapse.

Interpretation of the Policy presents a question of law, Swenson v. State Farm Fire & Cas. Co., 891 F. Supp. 2d 1101, 1107 (D.S.D. 2012), and this Court must use the Policy's language to determine the parties' "rights and obligations," Sioux Steel Co. v. Ins. Co. of Pa., 127 F.4th 1113, 1117 (8th Cir. 2025) (cleaned up and citation omitted) (applying South Dakota law). This Court construes the Policy's language "according to its plain and ordinary meaning," and "can neither add language to nor rewrite" the Policy.[7] In re Certification of a Question of L. from U.S. Dist. Ct., D.S.D., Cent. Div., 960 N.W.2d 829, 834–35 (S.D. 2021) (citation omitted).

---

[7] "Even though the language in insurance contracts is to be construed liberally in favor of the insured and strictly against an insurer, that rule of construction applies only when the language of the contract is ambiguous." Sioux Steel, 127 F.4th at 1117 (cleaned up and citation omitted). The

The Policy states that Equitable must "send a written notice" of a policy lapse "to you and any assignee on our records at last known addresses." Doc. 15-1 at 12. The Plaintiffs argue that the word "send . . . clearly contemplates receipt." Doc. 33 at 11. But the plain and ordinary meaning of the word "send" is to "cause to be conveyed by an intermediary to a destination,"[8] Webster's II New Riverside University Dictionary 1062 (1984), and does not mean to receive. See also Black's Law Dictionary (12th ed. 2024) (defining "send" as "[t]o cause to be moved or conveyed from a present location to another place; esp., to deposit (a writing or notice) in the mail or deliver for transmission by any other usual means of communication with postage or cost of transmission provided for and properly addressed"). Neither this common understanding of "send" nor anything else in the Policy mandates receipt of the notice. Rather, Equitable's duty under this language was to "send" the notice. The Plaintiffs do not explain how this Court could require receipt without adding to or rewriting the Policy. And while neither party cites a South Dakota case construing a policy that requires the insurer to "send a written notice," courts faced with similar language have found receipt unnecessary. See Umerah v. John Hancock Life Ins., 458 F. App'x 880, 881–82 (11th Cir. 2012) (per curiam) (unpublished) (holding that, under Florida law, insurance policy that required the insurer to "send a notice to your last known address" shifted "the risk of delivery to the insured" and did not require actual receipt of the notice); Cash v. AXA Equitable Life Ins., 229 F. Supp. 3d 542, 547 n.10 (W.D. Tex. 2017) (explaining that an insurance policy stating the insurer "will send a written notice" did not require receipt of the notice (emphasis omitted)); see also Schneider v. Brown, No. CV980340692S, 2003 WL 22290993, at *4 (Conn.

---

Plaintiffs do not argue that the Policy is ambiguous, and a mere disagreement about what the Policy means does not create ambiguity. Id.

[8] Courts in South Dakota "often look to dictionary definitions" when language in an insurance contract is undefined. In re Certification, 960 N.W.2d at 835.

Super. Ct. Sept. 19, 2003) ("To 'send' does not generally connote receipt."); Herndon v. Mass. Gen. Life Ins., 28 F. Supp. 2d 379, 382–83 (W.D. Va. 1998) (holding that receipt of notice was unnecessary under policy stating that "[n]otice will be mailed to the last known addresses of the owner and to any assignee of record").

The Plaintiffs cite two cases—Donarski v. Lardy, 88 N.W.2d 7 (Minn. 1958), and Cox v. Brookings International Life Insurance Co., 331 N.W.2d 299 (S.D. 1983)—for their argument that Lima needed to receive notice of the policy lapse. Both cases are distinguishable. The automobile insurance contract in Donarski said that the insurer could cancel the policy "by mailing to the named insured at the address shown in this policy written notice." 88 N.W.2d at 9. The policy then explained that the "mailing of notice as aforesaid shall be sufficient proof of notice." Id. at 10. Although the Supreme Court of Minnesota held that this language and the state's public policy required receipt of the notice, id. at 10–12, that holding does little to help the Plaintiffs. First, the textual rationale in Donarski focused on the phrase "sufficient proof of notice." Id. at 11. The court found this phrase ambiguous and interpreted this ambiguity in the insured's favor to mean "that some notice of the cancellation of the insurance policy should actually be received by the insured." Id. at 11. The Policy here, though, has no similar "proof of notice" language. Second, the court in Donarski relied on the public policy of allowing adequate time for an insured to secure other automobile insurance. Id. at 12. The Plaintiffs have not pointed to any public policy in South Dakota requiring that Lima receive notice of a life insurance policy lapse. See Farmers All. Mut. Ins. v. Am. Fam. Ins., 23-CV-4154, 2024 WL 4333532, at *3 (D.S.D. Sept. 26, 2024) ("Courts in South Dakota will not void contracts under the pretext of public policy unless they are firmly and solemnly convinced that an existent public policy is clearly revealed." (cleaned up and citation omitted)).

The Plaintiffs' reliance on Cox v. Brookings International Life Insurance Co., 331 N.W.2d 299 (S.D. 1983), fares little better. The plaintiff in Cox sued his insurance company after it determined that a life insurance policy he had on his son who died in a motor vehicle accident had lapsed for a failure to pay premiums. Id. at 300. The insurance company had sent the plaintiff quarterly premium notices even though the policy had no provision whatsoever requiring notice that a premium was due. Id. at 300–01. The plaintiff maintained that he relied on these quarterly notices to know when to pay a premium and never received the last notice before the policy lapsed. Id.

The Supreme Court of South Dakota in Cox framed the "threshold issue" on appeal as "whether notice is necessary and if so what constitutes adequate notice to an insured that an insurance premium is due." Id. at 300. The court answered the first part of this question in the affirmative, relying on the "general rule" that an insurer's practice and custom can create a notice requirement "even absent a policy provision." Id. at 301. The insurance company's three-year practice of sending quarterly premium notices, the court found, made continued notice necessary unless the insurer notified the insured it was discontinuing the practice. Id. The trial court, however, had directed a verdict for the insurer on the theory that the insurer provided the plaintiff with proper notice. Id. at 300–01. The insurance company had presented testimony from its employees and a mail log to show that it mailed the relevant notice to the plaintiff. Id. at 301. Although the Supreme Court of South Dakota agreed that this "proof of mailing" raised a rebuttable presumption of delivery, it found that the plaintiff's evidence—including testimony that he never received the notice, evidence of his household procedures for handling mail, and his payment of premiums on other policies during the lapse period—created a question of fact on the "issue of receipt." Id. at 301–02.

The Plaintiffs contend that the facts here are "nearly identical" to those in <u>Cox</u>, with Equitable establishing a custom of sending notices of a policy lapse but then failing to send Lima the relevant notice. Doc. 33 at 9. Since the court in <u>Cox</u> required that the plaintiff receive notice, the Plaintiffs reason, then so too do the facts here. Doc. 33 at 17 n.10. But the Plaintiffs overread <u>Cox</u> to extend that decision well beyond its facts. The policy in <u>Cox</u> was silent on notice or receipt of notice of premiums due, but the Policy here both required notice and specified the method of that notice. Unlike the court in <u>Cox</u>, then, this Court is not free to determine "what constitutes adequate notice" but must apply the Policy as it is written. 331 N.W.2d at 300; <u>see</u> <u>Sioux Steel</u>, 127 F.4th at 1117 (applying South Dakota law and requiring use of policy language to determine "rights and obligations"). Beyond that, Lima's evidence that she relied on the notices of policy lapse Equitable would send doesn't somehow translate into Equitable having a duty to ensure that she *received* the notices. Were that the case, every policy in South Dakota requiring notice would also require receipt of that notice, regardless of the policy's language. In sum, the Policy only required Equitable to send Lima written notice at her last known address, not ensure that she received the notice.

## 2. A Question of fact exists on whether Equitable mailed the notice of policy lapse.

Equitable contends that it is entitled to summary judgment because there is no dispute that it sent Lima notice of the policy lapse by United States Mail. Since the Policy does not require receipt, Equitable argues, Lima's testimony about nonreceipt and her procedures for handling mail is irrelevant. The sort of evidence Lima offers, however, can be relevant even when the policy only requires the insurer to send written notice. See <u>Custer v. Murphy Oil USA, Inc.</u>, 503 F.3d 415, 420–21 (5th Cir. 2007) (explaining that although a "plaintiff's bare assertion of non-receipt"

is not enough to "create a genuine issue of material fact," evidence "of non-receipt can be used to establish that the notice was never mailed"); 2 Jordan R. Plitt et al., Couch on Insurance § 32:21 (3d ed. Dec. 2024 Update) ("Even when proof of mailing is considered evidence of notice of cancellation, this proof is not conclusive, and an insured can offer proof of nonreceipt for the purpose of refuting the hypothesis of mailing."). The question here is whether there is a genuine issue of material fact as to whether Equitable sent Lima notice of the policy lapse.

The Supreme Court of South Dakota has found sufficient evidence that an insurance company mailed a notice when the company offers testimony from an employee familiar with the company's mailing procedures and some physical evidence that notice was sent. In Moore v. Farmers Insurance, 323 N.W.2d 870 (S.D. 1982), for instance, the court found sufficient proof of mailing where the insurance company offered summaries of its records and an affidavit from an employee explaining that the records showed that the company mailed the notice. Id. at 871–72. The court in Cox likewise found sufficient proof of mailing based on employee testimony about the insurance company's mailing practices and a mail log. 331 N.W.2d at 301 ("There was testimony from a company official and a mailroom employee as to the procedure, and mail logs that demonstrate mailing of the particular piece in question.").

These cases show that Equitable's evidence, if uncontradicted, would be enough to establish that it sent Lima the notice of policy lapse. See Cox, 331 N.W.2d at 301; Moore, 323 N.W.2d at 871–82; see also Davis v. U.S. Bancorp, 383 F.3d 761, 766 (8th Cir. 2004) (finding uncontradicted employee affidavit describing company procedures and sending of notice was "sufficient to establish that the notice was sent"). Bhambri explains in her affidavit that Equitable's computer system automatically generates a notice of policy lapse when a policy drops below the necessary value. Doc. 27 ¶¶ 19–20. She states that the system generated a notice of policy lapse

14

for Lima on July 24, 2023, and that this notice was included in a batch of notices sent electronically to Broadridge that same day. Id. ¶¶ 21–23. Bhambri identifies the print file number for this batch of notices and attached a reconciliation report to her affidavit that shows an entry listing Lima's policy number within the print file. Doc. 27 ¶¶ 23–24; Doc. 27-5 at 4. According to Bhambri, this entry for Lima's policy number refers to the notice of policy lapse Equitable generated for Lima. Doc. 27 ¶ 24. Rapino attests in his affidavit that Broadridge's daily regimen for processing notices from Equitable is to print customer copies of the notices, place the notices in an envelope bearing Equitable's return address, and mail the notices to the policy holder via the United States Postal Service. Doc. 26 ¶ 4. Rapino explains that Broadridge received the print file containing Lima's notice of policy lapse on July 25, 2023, and that Broadridge printed and mailed the notice to Lima at her Marion, South Dakota, address that same day. Id. ¶¶ 6–8. He attached an automated systems report from Broadridge that includes an entry listing Lima's policy number and identifying July 25, 2023, as the date the print job for that policy number was mailed. Doc. 26-1 at 7; Doc. 26 ¶¶ 8–9. Rapino testifies that this entry references the notice of policy lapse Broadridge sent to Lima, Doc. 26 ¶ 8,[9] and Lima does not dispute that the notice of policy lapse was never returned as undeliverable to Equitable, Doc. 23 ¶ 34; Doc. 30 ¶ 34. Equitable also filed the notice it claims it sent Lima, which was dated July 24, 2023, and had her Marion, South Dakota, address listed at the top. Doc. 27-4.

The Plaintiffs argue that the affidavits and reports Equitable filed are not "conclusive proof" that Equitable printed and mailed the notice of policy lapse to the correct address. Doc. 33 at 12; see also Doc. 30 at ¶ 33. Lima also filed a declaration testifying that she never received the notice of policy lapse and describing her daily routine for collecting and sorting her mail, including

---

[9]These reports do not include the address to which the notice was mailed.

bills she pays by check. Doc. 31 ¶¶ 19–22. Lima pays these bills by sending a check and declares that she hasn't missed a payment on any of these bills for the last five years. Id. ¶ 21. Lima paid multiple bills she received through the mail in July through September 2023 and attests that she had ample money in her checking account to pay the $2,070 needed to keep the Policy from terminating. Id. ¶ 23; Doc. 31-5. She also notes that, when the Policy had lapsed before, she would help her mother make the required payments to keep the Policy from terminating. Doc. 31 ¶¶ 7–8.

The Plaintiffs contend that this evidence is enough to create a genuine issue of material fact under Cox. But the court in Cox found a question of fact on "the issue of receipt," not on whether the insurance company had sent the notice to begin with. 331 N.W.2d at 301–02. The court in Cox found a duty for the insurer to give notice of premiums being due based on its past practices, but then, upon noting a dispute over if the notice was sent or received, began discussing the "mailbox rule." Id. at 301. The court in Cox noted that proof of proper mailing raises a rebuttable presumption of "delivery to the person addressed." Id. This rule, though, "only comes into play when there is a material question as to whether a document was actually received." Custer, 503 F.3d at 419; see also Fed. Kemper Life Assurance v. Ellis, 28 F.3d 1033, 1040 (10th Cir. 1994) (rejecting insured's reliance on cases dealing with the presumption of receipt upon mailing where contract only required the insurance company to mail the notice). Cox's discussion about sufficient proof of mailing remains somewhat relevant here, however. See Custer, 503 F.3d at 419 (explaining that the mailbox rule was "still germane" where issue was whether notice was mailed because a "threshold question for the application of the mailbox rule is whether there is sufficient evidence that the letter was actually mailed"). Cox, however, ultimately is distinguishable because the fact question was on "the issue of receipt." 331 N.W.2d at 301–02.

Cases from other states better illustrate the sort of evidence necessary to create a genuine question of material fact on whether an insurance company sent notice. These cases make clear that a bare denial of receiving notice is not enough to create a jury question when the insurance company offers evidence of its mailing procedures and some physical evidence that notice was probably sent. The district court in <u>Cash</u>, for example, found no genuine issue of material fact on whether the insurance company mailed the plaintiff notice when the company offered evidence of mailing much like what Equitable offered here and the plaintiff submitted only a conclusory statement in an affidavit denying receipt of the notice at her office. 229 F. Supp. 3d at 548–550. Despite her affidavit, the plaintiff had acknowledged in her deposition that she was out of the office around the time the notice was allegedly sent and that her employees had a complicated process for handling the mail when she was out. <u>Id.</u> at 546. The Tenth Circuit in <u>Ellis</u> affirmed summary judgment for the insurance company under similar circumstances. 28 F.3d at 1040. The insured testified that the notice never "cross[ed] her desk" and offered testimony from her bookkeeper denying receipt. <u>Id.</u> at 1037. The bookkeeper acknowledged, however, that she did not know whether the notice might have been misrouted at the company where she worked. <u>Id.</u> The Tenth Circuit held that the insured's "[s]imple denial of receipt" did not create a jury question given the insurance company's evidence of standard mailing procedures and a status report showing that the notice was created and mailed to the insured. <u>Id.</u> at 1040. Still another example is <u>Yarnell v. Transamerica Life Insurance</u>, 447 F. App'x 664 (6th Cir. 2011) (per curiam), in which the Sixth Circuit held that the plaintiff's conclusory affidavit denying receipt of the notices did not create an issue of material fact when her deposition testimony contradicted the affidavit and the insurance company offered the remittance stub showing that at least one of the notices had been

17

received and billing reference lists identifying the date the notices were mailed, the type of notice sent, and the address to which the notice was mailed. 447 F. App'x at 672–74.

Courts have found a genuine issue of material fact, though, when the insured offers more than just a weak denial of receipt. In Conestoga Trust v. Columbus Life Insurance, No. A-15-CA-152-SS, 2016 WL 8711403 (W.D. Tex. July 29, 2016), for example, the district court denied summary judgment despite the insurance company offering the notice it allegedly sent the plaintiff, a job ticket for the batch of mail containing the notice, quality control records confirming two of its employees inspected the notice after it was processed, and evidence that other pieces of mail in the same batch were received by the intended recipients. Id. at *6. The plaintiff responded with testimony that it did not receive the notice, statements from three of its employees about its regular business practices for receiving mail, testimony that those practices were followed during the relevant time, and evidence that it had received other time-sensitive notices without a problem. Id. at *6–7. The district court found that the plaintiff's evidence was enough to create a genuine issue of material fact on whether the insurance company had mailed the notice of policy lapse. Id.

A question of fact may also exist when the insurance company offers evidence of its customary mailing procedures but nothing to show that the procedures were followed on the date it allegedly sent notice. See Lynch v. N. Am. Co. for Life & Health, 300 F. Supp. 3d 1158, 1165, 1170–71 (D. Idaho 2018). The insurance company in Lynch offered employee testimony about its customary practice for mailing grace notices and evidence that another business had received the same notice allegedly mailed to the insured; the company did not produce any computer logs or similar evidence indicating that the notice was sent, however, and its employee lacked personal knowledge about whether the company followed customary practice on the relevant day. Id. at

1165. The district court found that the insured's denial of receipt and her receipt of and response to 36 other grace notices created a question of fact. Id. at 1170–71.

The facts here fall somewhere between these cases. Although Equitable's evidence of mailing is on par with that presented in Cash and Ellis and surpasses the evidence in Lynch, Lima offered stronger rebuttal evidence than the insureds in Cash and Ellis. Rather than merely denying receipt, Lima described her daily routine for receiving and sorting mail, showed that she paid multiple bills she received by mail during the grace period, and testified that she helped her mother make payments in the past when the Policy had lapsed. Doc. 31 at ¶¶ 7–8, 19–23; Doc. 31-5. And unlike the insureds in Cash and Ellis, Lima has not made any admissions undermining her testimony that she never received the notice of policy lapse. Lima's evidence might not be as strong as that presented by the plaintiff in Conestoga Trust, but it is just enough, especially given that the Plaintiffs haven't been able to conduct the planned Rule 30(b)(6) deposition, to create a genuine issue of material fact on whether Equitable mailed her notice of the policy lapse. Equitable is not entitled to summary judgment on the Plaintiffs' breach of contract claim or its counterclaim seeking a declaration that it did not breach the Policy.

### 3. Bad Faith

First-party bad faith is an intentional tort that "typically occurs when an insurance company consciously engages in wrongdoing during its processing or paying of policy benefits to its insured." Hein v. Acuity, 731 N.W.2d 231, 235 (S.D. 2007). The oft-repeated test for bad faith under South Dakota law requires the plaintiff to show (1) an absence of a reasonable basis for denial of policy benefits; and (2) knowledge or a reckless disregard of the lack of a reasonable basis for the denial. Phen v. Progressive N. Ins., 672 N.W.2d 52, 59 (S.D. 2003); Anderson v. W. Nat'l Mut. Ins., 857 F. Supp. 2d 896, 903–04 (D.S.D. 2012). Despite the phrasing of this test,

19

first-party bad-faith claims in South Dakota "can extend to situations beyond mere denial of policy benefits." Dakota, Minn. & E. R.R. Corp. v. Acuity, 771 N.W.2d 623, 629 (S.D. 2009) (citation omitted). A bad-faith claim in South Dakota may be based on a "failure to comply with a duty under the insurance contract," but still must involve "an insurance company consciously engag[ing] in wrongdoing." Id. (cleaned up and citation omitted); see also Hein, 731 N.W.2d at 235 ("[A] frivolous or unfounded refusal to comply with a duty under an insurance contract constitutes bad faith.").

An insurer has a reasonable basis for denying benefits—and therefore cannot be liable for bad faith—if the claim is "fairly debatable" in either law or fact. Dakota, Minn. & E. R.R., 771 N.W.2d at 630 ("If an insured's claim is fairly debatable . . . an insurer cannot be said to have denied the claim in bad faith." (citation omitted)); Phen, 672 N.W.2d at 59 (explaining that an insurance company is liable for bad faith "only where it has intentionally denied (or failed to process or pay) a claim without a reasonable basis"). The "fairly debatable" standard focuses "on the existence of a debatable issue, not on which party was correct." Dakota, Minn. & E. R.R., 771 N.W.2d at 630 (citation omitted). Thus, an insurer is not guilty of bad faith simply because its decision to deny benefits was mistaken. Id. Whether an insurer acted in bad faith is "determined based upon the facts and law available to the insurer at the time it made the decision to deny coverage." Dakota, Minn. & E. R.R., 771 N.W.2d at 629 (cleaned up and citation omitted). Although the question of bad faith is generally one for the finder of fact, id. at 629–30, courts will grant summary judgment when the insurer had a reasonable basis for its actions, Sioux Steel Co. v. Ins. of Pa., 709 F. Supp. 3d 806, 826 (D.S.D. 2023); Swenson v. Auto Owners Ins., 831 N.W.2d 402, 412 (S.D. 2013).

The Plaintiffs allege in their amended complaint that Equitable committed insurance bad faith by failing to provide a notice of policy lapse, terminating the Policy without a reasonable basis, refusing to reinstate the Policy, and failing to properly investigate whether it had issued the required notices.  Doc. 12 at ¶¶ 45–47.  These allegations cannot survive Equitable's motion for summary judgment.

First, the Plaintiffs have not shown a genuine issue of material fact on whether Equitable engaged in bad faith by allegedly failing to send Lima notice of the policy lapse.  Although Lima offered just enough evidence to create a question of fact on whether Equitable sent the notice, that evidence falls well short of showing that Equitable engaged in the sort of conscious wrongdoing necessary to sustain a bad-faith claim.  See Isaac v. State Farm Mut. Auto. Ins., 522 N.W.2d 752, 759 (S.D. 1994) ("Bad faith actions . . . must be predicated on more than the negligence of another.").  Equitable had an established procedure for generating and mailing a notice of policy lapse when a policy dropped below a certain value.  See Doc. 27 ¶¶ 17–24; Doc. 26 ¶¶ 3–9.  Equitable's computer system created a reconciliation report listing the files sent to Broadridge for printing, Doc. 27 ¶ 24; Doc. 27-5, and Broadridge's system generated a similar report that allowed Broadridge to ensure that it mailed all the notices received from Equitable, Doc. 26 ¶¶ 4–8; Doc. 26-1.  These reports suggest that Equitable sent the notice of policy lapse to Lima, and the notice was never returned to Equitable as undeliverable.  The Plaintiffs have not offered any evidence that Equitable should have questioned the reliability of its notice system around the time it allegedly failed to send Lima a notice of policy lapse and notice of termination.  Nor have the Plaintiffs established in their Rule 56(d) affidavit that discovery through a Rule 30(b)(6) deposition

would sniff out bad faith.[10]   In short, Equitable had a reasonable basis for trusting its notice system and believing it sent Lima notice.

Second, the Plaintiffs have not shown a genuine issue of material fact on whether Equitable lacked a reasonable basis for terminating the Policy.   After all, the Policy lapsed in July 2023, Equitable had a reasonable basis for believing it sent Lima notice of this lapse, and Lima failed to make the requisite $2,070 payment within the grace period necessary to keep the Policy from terminating.   Lima, however, points to her statements to Equitable that she wasn't receiving their communications.   When Lima called Equitable on January 16, 2024, to ask why her online account had been closed, an Equitable representative said that, because Lima was just discovering that the Policy had been terminated, the representative "assume[d]" that Lima did not receive the notice of policy termination.   Doc. 31-4.   During the March 13, 2024 phone call with an Equitable representative, Lima denied having received the notice of policy lapse and said she was not getting Equitable's correspondence.   Doc. 31-8.   The Plaintiffs argue that Equitable did not properly investigate Lima's claims that she wasn't receiving the notices and that it recklessly disregarded this information.   According to the Plaintiffs, Equitable limited its investigation to reviewing the computer reports it filed in support of its motion for summary judgment.   Doc. 33 at 16; Doc. 31-9 at 2–3.

The Plaintiffs are correct that an insurer's flawed investigation and consideration of a claim may justify a bad-faith claim.   Wiebers v. Farmers Mut. Ins. of Iowa, 17-CV-04126, 2019 WL 6769546, at *7 (D.S.D. Dec. 12, 2019) (collecting cases).   For example, courts will infer that the insurer knew of or recklessly disregarded the lack of a reasonable basis when the insurer is

---

[10]The Plaintiffs effectively would have to prove that Bhambri and Rapino committed perjury in their affidavits to have a bad faith claim, and if that is the case, this Court would entertain an untimely motion to amend from the Plaintiffs.

"indiff[erent] to facts or to proofs submitted by the insured." <u>Zochert v. Protective Life Ins.</u>, 921 N.W.2d 479, 490 (S.D. 2018) (citation omitted). No such inference is appropriate here, though. Short of accepting Lima's allegations of nonreceipt as true, the Plaintiffs do not explain what else Equitable should have done to investigate whether it sent her the notices of policy lapse and termination. The computer reports and Equitable's established procedure gave Equitable a reasonable basis for believing that it sent the notices even though Lima claimed that she hadn't received them. Lima confirmed to the Equitable representative during a March 2024 call that Equitable had the correct address for her. Doc. 31-8. Equitable's investigation and termination of the Policy as a matter of law do not amount to bad faith under these facts.

Equitable having a reasonable basis for terminating the Policy also dooms the Plaintiffs' argument that Equitable engaged in bad faith by refusing to reinstate it. Although the Plaintiffs say little about this argument in their brief, it appears to depend on their claim that Equitable lacked a reasonable basis for terminating the Policy in the first place. <u>See</u> Doc. 33 at 13, 16. Since Equitable had a reasonable basis for terminating the Policy, its refusal to reinstate the Policy is not bad faith. There is no genuine issue of material fact that Donald's health conditions did not "[p]rovide evidence of insurability satisfactory" to Equitable. Doc. 15-1 at 13. Equitable is entitled to judgment as a matter of law on the Plaintiffs' bad-faith claim.

### 4. Unjust Enrichment

Equitable argues that the Plaintiffs' unjust enrichment claim fails as a matter of law because an express contract governs the parties' rights. Parties in South Dakota generally cannot recover on an unjust enrichment claim when there is a valid contract that covers the same subject matter and provides the parties an adequate remedy at law. <u>See</u> <u>Johnson v. Larson</u>, 779 N.W.2d 412, 416 (S.D. 2010) ("[T]he equitable remedy of unjust enrichment is unwarranted when the rights of the

23

parties are controlled by an express contract."); Paweltzki v. Paweltzki, 964 N.W.2d 756, 769 (S.D. 2021) ("A request for relief because of unjust enrichment sounds in equity, and it is well settled that an essential element to equitable relief is the lack of an adequate remedy at law." (cleaned up and citations omitted)). Rather, "[w]hen there is a valid and enforceable contract, . . . liability for compensation or other resolution of the breach is fixed exclusively by the contract." Johnson, 779 N.W.2d at 416.

The Plaintiffs allege that Equitable has been unjustly enriched by receiving 40 years of premiums and then "wrongly" terminating the Policy without providing anything to them.[11] Doc. 12 ¶¶ 49–51. The terms of the Policy control when and how Equitable could terminate it, and the Plaintiffs' breach of contract claim provides them an adequate remedy at law. A claim for unjust enrichment is unavailable under these facts. See Paweltski, 964 N.W.2d at 769 (holding that a party did not have a claim for unjust enrichment when they had an adequate remedy at law "via their claims for breach of contract, breach of fiduciary duty, civil theft, and conversion"); Surgical Inst. of S.D. v. Sorrell, 816 N.W.2d 133, 141 (S.D. 2012) (affirming grant of summary judgment on unjust enrichment claim where contracts and written amendments "fully fix[ed] the parties' rights" and "occupied the field").

The Plaintiffs cite Lundstrom v. Daniel M. Homolka P.A., 19-CV-01006, 2020 WL 1891696 (D.S.D. Apr. 16, 2020), and argue that while they cannot recover twice for the same conduct under claims for breach of contract and unjust enrichment, they can still plead in the

---

[11]Although the Plaintiffs claim that Equitable "provided nothing" to them, this misunderstands the nature of life insurance. When the Policy was in effect, Equitable provided the Plaintiffs with the benefit and protection of having life insurance. See Mut. Rsrv. Fund Life Ass'n v. Ferrenbach, 144 F. 342, 345 (8th Cir. 1906) ("Not only is the protection of [life] insurance of actual, positive value while it endures, but the cost to the insurer of carrying the risk can be ascertained almost to a mathematical certainty.").

alternative. This Court in <u>Lundstrom</u> denied a motion to dismiss an unjust enrichment claim when the plaintiff also brought a claim for breach of an oral contract. <u>Id.</u> at *5. Although acknowledging that unjust enrichment claims fail when there is a valid contract covering the issue between the parties, this Court denied the motion because it had yet to determine whether the parties had a valid oral contract. <u>Id.</u> Unlike in <u>Lundstrom</u>, there is no dispute that the Policy is a valid contract and that the Plaintiffs have an adequate remedy at law through their breach of contract claim. This Court cannot deny summary judgment on the unjust enrichment claim just because the Plaintiffs may not ultimately recover for breach of contract. <u>See</u> <u>Pawelski</u>, 964 N.W.2d at 769 ("Equity generally will not provide relief where an adequate remedy at law existed and defendant was denied that relief for appropriate legal reasons." (cleaned up and citation omitted)).

The Plaintiffs also argue that they can bring an unjust enrichment claim because "Equitable claims there is no express contract between the parties because it was terminated." Doc. 33 at 17. That isn't correct, though. Equitable argued that it is entitled to summary judgment on the breach of contract claim because it complied with the terms of the Policy, not because there was no contract on which the Plaintiffs could sue. Equitable is entitled to judgment as a matter of law on the unjust enrichment claim.

### 5. The Plaintiffs' Declaratory Judgment Claim

The Plaintiffs' amended complaint seeks a declaratory judgment requiring Equitable to remit the $400,000 death benefit under the Policy. Doc. 12 ¶ 44. Equitable moved for summary judgment on this claim, arguing that it terminated the Policy in accordance with its terms and that the Policy does not require Equitable to make any payment until Donald dies.[12] The Plaintiffs

---

[12]The Policy provides: "We will pay the Insurance Benefit of this policy to the beneficiary when we receive at our Administrative Office (1) proof satisfactory to us that the insured person died

respond that declaratory relief is a distinct remedy from breach of contract and that "a declaration that the policy was wrongfully terminated by Equitable has a nexus to Plaintiffs' claim for bad faith."[13]  Doc. 33 at 18.  The Plaintiffs also argue that Donald's death is not a prerequisite to damages for the value of the contract because Equitable wrongfully terminated the Policy.  In support, they cite an American Law Reports article stating that when "an insurer wrongfully cancels, repudiates, or terminates a contract of insurance, the insured . . . may elect to consider the policy at an end and recover the just value of the policy or such measure of damages as the court in its particular jurisdiction approves."  34 A.L.R.3d 245 § 3 (Originally published in 1970).

Equitable is entitled to summary judgment on the Plaintiffs' declaratory judgment claim. The American Law Reports article the Plaintiffs cite includes a footnote explaining that the article does not cover "cases in which an insurer's attempted cancellation, however wrongful, was not effective because of the mode of cancellation, such as its failure to give proper notice."  Id. § 1 n.2.  The district court in Goldstein v. Lincoln National Life Insurance Co., WMN-09-706, 2012 WL 1044325 (D. Md. Mar. 27, 2012), held that the article and the cases cited therein did not apply to a case where the insured claimed that the insurance company failed to provide the necessary notice before terminating a life insurance policy.  Id. at *3–4.  Applying Maryland law, the court held that the insured, who was still alive, could not recover the present value of the policy death benefit as damages but could only have the policy reinstated subject to payment of past due premiums.  Id. at *2–4.

---

before the Final Policy Date; and (2) all other requirements we deem necessary before such payment may be made."  Doc. 15-1 at 9.

[13]As Equitable notes in its reply brief, the amended complaint sought a declaratory judgment requiring Equitable to remit the death benefit under the Policy, not a declaration that Equitable wrongfully terminated the Policy.  In any event, this Court is granting summary judgment on the bad-faith claim.

The Plaintiffs have cited no case holding that a living insured—or the owner of a policy on a living insured—can recover the entire death benefit of a life insurance policy when the insurance company terminated the policy for a failure to pay premiums but did not provide the necessary notice. Indeed, one insurance treatise has explained that "there appears to be no authority in any jurisdiction awarding the present value of the policy death benefit to a living insured merely because the insured failed to receive a grace period notice prior to lapse for nonpayment of premiums." Michael P. Cunningham, New Appleman on Insurance: Current Critical Issues In Insurance Law IV (Spring 2013).

### 6. Standing

Equitable argues that, because Lima was the sole owner and beneficiary of the Policy when it was terminated, the Hofers lack the injury in fact necessary for standing in South Dakota. The Hofers must have standing under South Dakota law to sue Equitable in this diversity case. McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank, 11 F.4th 702, 708 (8th Cir. 2021). Plaintiffs in South Dakota must show they suffered "an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Black Bear v. Mid-Cent. Educ. Coop., 941 N.W.2d 207, 212 (S.D. 2020) (cleaned up and citation omitted).

The Plaintiffs alleged in their amended complaint that Donald was the insured, Marjorie was the beneficiary, and Lima owned the Policy. Doc. 12 ¶ 10. The Plaintiffs' brief acknowledges that this is incorrect, however, explaining that Lima had forgotten she made herself the Policy's beneficiary until after this lawsuit was filed and she received discovery from Equitable. Although the Plaintiffs argue that the standing question "requires some parsing of claims," it is not clear which claims they believe the Hofers have standing to bring. For instance, while the Plaintiffs

assert that Marjorie and Donald have standing to bring the unjust enrichment claim, they do not address the other claims.

Citing to SDCL § 58-10-4, the Plaintiffs argue that Marjorie "has a statutorily recognized insurable interest in personal insurance for her husband."[14] Doc. 33 at 20. But § 58-10-4 merely defines an "insurable interest" for purposes of determining when someone can take out an insurance policy on another. See SDCL §§ 58-10-3, 58-10-4. The Plaintiffs fail to explain how this statute could give Marjorie a legally protected interest in a policy for which she is neither the owner nor named beneficiary, and do not argue that she is a third-party beneficiary. See 16 Williston on Contracts § 49:8 (May 2025 Update) ("Generally . . . a person other than the insured or owner of the policy, who is not named as the beneficiary, has no right of action against the insurer, unless there is a showing that the particular third party, although not named in the policy, is an intended beneficiary of the contract . . . .").

As for Donald, Plaintiffs cite Mahan v. Charles W. Chan Ins. Agency, Inc., 222 Cal. Rptr. 3d 360 (Cal. Ct. App. 2017), a case where a California court of appeal held that an elderly married couple had a property interest under California's Elder Abuse and Dependent Adult Civil Protection Act in two life insurance policies they had taken out on themselves and placed in a trust for their children. Mahan, however, does not say that an "insured" person under a life insurance policy always has standing to sue. And the Policy does not suggest the "insured person" remains a party to the contract once he transfers ownership of the Policy to someone else. See Doc. 15-1 at 9 (explaining that the "owner of this policy is the insured person unless . . . later changed" and

---

[14] Section 58-10-4(1) provides that "Insurable interest with reference to personal insurance includes only interests as follows: (1) Interests in individuals related closely by blood, marriage, or by law, a substantial interest engendered by love and affection."

that "[a]s the owner, you are entitled to exercise all rights of this policy while the insured person is living"). The Hofers did not suffer an injury in fact necessary for standing to bring this lawsuit.

**IV.    Conclusion**

For the reasons explained above, it is

ORDERED that Equitable's motion for summary judgment, Doc. 22, is granted as to the Plaintiffs' claims for bad faith, unjust enrichment, and declaratory judgment. It is further

ORDERED that Equitable's motion for summary judgment, Doc. 22, is denied as to Lima's claim for breach of contract but granted as to claims of the Hofers for breach of contract due to lack of standing.

DATED this 11th day of June, 2025.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE